UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UPDATEME INC.,<br>       Plaintiff,<br>    v.<br>AXEL SPRINGER SE, *et al*.,<br>       Defendants. | Case No. 17-cv-05054-SI<br><br>**ORDER DENYING DEFENDANTS' MOTIONS TO DISMISS THE FIRST AMENDED COMPLAINT**<br><br>Re: Dkt. Nos. 63, 80 |

On January 19, 2018, the Court heard argument on the motion to dismiss the First Amended Complaint brought by defendants Axel Springer SEW, Axel Springer Services, Inc., and Axel Springer Digital Ventures GMBH. (Dkt. No. 63). Since that time, a similar motion was filed by defendant upday GMBH & Co. KG. (Dkt. No. 80). As of March 1, 2018, both motions are fully briefed and submitted. Both are resolved below.

## BACKGROUND

### I. Factual Background

The following facts are drawn from the First Amended Complaint ("FAC"), which the Court treats as true for the purposes of this motion. Plaintiff Updateme Inc. is a Delaware corporation with its principal place of business in Palo Alto, California. FAC ¶ 5 (Dkt. No. 51). Defendant Axel Springer SE is a societas Europaea[1] with its principal place of business in Berlin, Germany. *Id.* ¶ 6. Defendant Axel Springer Services, Inc. is a Delaware corporation with its

---
[1] The complaint defines societas Europaea as a "public company registered in accordance with the corporate law of the European Union." Compl. ¶ 6.

principal place of business in New York. *Id.* ¶ 7. Defendant Axel Springer Digital Ventures GmbH ("ASDV") is a "Gesellschaft mit beschrankter Haftung"[2] with its principal place of business in Berlin, Germany. *Id.* ¶ 8. Defendant upday GmbH & Co. KG ("upday") is a Kommanditgesellschaft[3] with its principal place of business in Berlin, Germany. *Id.* ¶ 9. Axel Springer Services, ASDV, and upday are all wholly owned subsidiaries of Axel Springer SE. *Id.* ¶ 11. The complaint refers to all four defendants collectively as "Axel Springer."

Updateme is a "mobile news-aggregation application" that aims to provide algorithmically tailored "short bullets of news" based on "Terms" or topics the user selects. *Id.* ¶¶ 36-39. Updateme owns two federally registered trademarks for the app: U.S Trademark No. 4,777,341 for the character mark "updatemi," registered for providing a website with news bulletins, and U.S. Trademark No. 4,777,340 for the word "updatemi" in a lowercase font with a magenta solid circle above the "i" and three magenta solid circles below the "i," registered for the same purpose. *Id.* ¶¶ 42-43. Updateme has continuously used the updatemi® marks in commerce and advertising and claims they are both inherently distinctive and have acquired secondary meaning. *Id.* ¶¶ 44-46. In September 2014, updatemi® changed the logo, incorporating a pink "smiley" logo without eyes. *Id.* ¶ 73.

Beginning in 2012, Axel Springer representatives arrived in Silicon Valley to build a "European partnership" with the startup community in hopes of digitizing their news service. *Id.* ¶ 47-48. Updateme co-founder Michael Hirschbrich first met with two Axel Springer representatives—Kai Diekmann and Peter Würtenberger (now CEO of upday)—at an informal meeting in San Francisco, California, on or about February 7, 2013, to discuss possible investment

---

[2] "Gesellschaft mit beschrankter Haftung" is "a legal entity registered in accordance with the corporate law of Germany." *Id.* ¶ 8.

[3] Kommanditgesellschaft is a "public company registered in accordance with the corporate law of Germany." *Id.* ¶ 9.

2

and partnership with Axel Springer. *Id.* ¶¶ 49, 51. Following this and other informal meetings, Hirschbrich presented a formal pitch of the updatemi® app to Diekmann at his Palo Alto house on or about February 24, 2013. *Id.* ¶¶ 55-56. In accordance with startup industry practices, the parties had "the specific understanding that the information would only be used by Axel Springer to evaluate a possible investment or joint venture." *Id.* ¶¶ 57-59.

In the summer of 2013, Diekmann invited Hirschbrich to present information on updatemi®'s product strategy, business model, and monetization strategy to two additional Axel Springer representatives in Silicon Valley for a possible collaboration. *Id.* ¶¶ 61-63. At Diekmann's urging, on March 18, 2014, Hirschbrich met with two new representatives—Anton Waitz, Managing Director for ASDV, and his assistant, Mischa Gorbunow—in Silicon Valley to conduct a formal pitch and two-hour demonstration of the private prototype of the updatemi® app. *Id.* ¶¶ 65-67. Waitz and Gorbunow made similar assurances about not using plaintiff's information for purposes other than evaluating an investment in plaintiff. *Id.* ¶¶ 66, 69, 72.

On October 4, 2014, a different Axel Springer manager, Malte Goesche, invited Hirschbrich to come to Berlin to discuss Hirschbrich's vision for an investment in updatemi®. *Id.* ¶ 74. Hirschbrich then suggested two monetization modes: pre-installing the app with mobile phone companies and preferring Axel Springer sources when pushing updates. *Id.* Hirschbrich also showed Goesche a "card-design model for the application, where the user viewed cards containing Updates with a headline and bullets, and where the user could swipe through different cards[.]" *Id.*

In November 2014, Waitz reiterated Axel Springer's interest in the app and asked Hirschbrich to send Waitz a written description of the updatemi® app functionality along with a pitch document. *Id.* ¶¶ 77-78. Hirschbrich emailed the requested documents and followed up with Goesche on November 11, 2014. *Id.* ¶¶ 78-79. Goesche informed Hirschbrich that Goesche shared the materials with Daniel Böcking and Julian Riechelt—management at *Bild*, an Axel

3

Springer tabloid—who expressed strong interest in a partnership. *Id.* ¶¶ 79-80. Between November 2014 and January 2015, Goesche informed Hirschbrich that he shared information on updatemi® with the *Bild* brand's Audience Development Workshop and Sebastian Bourmer, another Axel Springer representative. *Id.* ¶¶ 82-83.

On September 1, 2015, Axel Springer issued a press release announcing the launch of a new product called "upday." *Id.* ¶ 85. Plaintiff alleges upday incorporates information stolen from Updateme's investment pitches. *Id.* ¶ 84. [U]pday provided an algorithm-tailored news bulletin based on a user's topics of interest, used a smiley logo without eyes, and, as of February 22, 2016, was pre-installed on certain Samsung smartphones in Germany, Poland, France, and the United Kingdom. *Id.* ¶¶ 85-88. The app is also available for download in the United States on the Google Play store. *Id.* ¶ 89.

In its 2016 Annual Report, Axel Springer announced that upday had already become one of the top ten online news brands in Germany. *Id.* ¶ 92. Axel Springer also announced it was planning further expansion into other European countries. *Id.* ¶¶ 92-93. Plaintiff alleges the upday app's concept, functionality, logo, name, and business plan are all nearly identical to the information from updatemi® pitches. *Id.* ¶¶ 95-102.

**II.     Procedural Background**

Plaintiff initially warned defendants of its intent to sue under California and German law in a pair of January 21, 2016, letters from its California and German legal teams, respectively. First Mallman Decl. Exs. B, C (Dkt. No. 17). The parties exchanged letters over several weeks and met for a failed attempt at an "amicable solution." First Mallman Decl. ¶ 7. On June 10, 2016, Axel Springer SE, upday, and Axel Springer Digital Ventures Inc. filed a negative declaratory judgment action in the District Court of Berlin in Germany, asking the court to declare Updateme was not entitled to any claims against defendants in connection with the development and establishment of

4

the upday app.[4] *Id.* ¶ 8. Plaintiff Updateme submitted its mandatory responsive filing on October 7, 2016, but made no affirmative claims in German court. *Id.* ¶ 9. Plaintiff did not present further evidence beyond screenshots and did not call any witnesses, even those based in Germany. Second Mallman Decl. ¶ 8 (Dkt. No. 34-2). The German court scheduled a hearing for October 4, 2017. First Mallman Decl. ¶ 11.

On August 30, 2017, plaintiff filed the present lawsuit, asserting six claims: (1) breach of contract; (2) trademark infringement under the Lanham Act; (3) common law trademark infringement; (4) fraud; (5) promissory estoppel; and (6) unfair competition. Compl. (Dkt. No. 1).

On September 29, 2017, Plaintiff informed the German court that it had initiated proceedings in the United States. Second Mallman Decl. ¶ 9. The German court held its conciliation and oral hearing on October 4, 2017. *Id.* ¶ 10. Following the hearing, the District Court of Berlin granted the negative declaratory judgment, finding no valid claims under German law. *Id.* ¶ 13; *see also* Second Mallman Decl., Ex. B. A full decision including the grounds for judgment generally follows several weeks after a hearing. The German court has yet to issue a decision. Second Mallman Decl. ¶ 16.

On September 25, 2017, defendants Axel Springer SE, Axel Springer Services, and ASDV filed a motion to dismiss.[5] Mot. to Dismiss (Dkt. Nos. 15, 27). After oral argument, this Court granted in part and denied in part the motion to dismiss. Order (Dkt. 49). The Court denied the motion to dismiss in deference to German litigation but granted the motion to dismiss all six claims for failure to identify the defendants responsible for each allegation. *Id.* The Court allowed plaintiff leave to amend its complaint regarding trademark infringement and defendant

---

[4] According to the filings, the trademark for the upday app is registered with the German Patent and Trade Mark Office. First Mallman Decl. ¶ 2.

[5] At that time, defendant upday GMBH & Co. KG had not yet been served.

5

identification. *Id.* Plaintiff filed its first amended complaint on November 30, 2017. FAC (Dkt. 51). These motions followed.

**LEGAL STANDARD**

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "facial plausibility" standard requires the plaintiff to allege facts that add up to "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the court must assume that the plaintiff's allegations are true and must draw all reasonable inferences in the plaintiff's favor. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008). As a general rule, the Court may not consider any materials beyond the pleadings when ruling on a Rule 12(b)(6) motion. *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). However, pursuant to Federal Rule of Evidence 201, the Court may take judicial notice of "matters of public record," such as prior court proceedings, without thereby transforming the motion into a motion for summary judgment. *Id.* at 688-89.

If the Court dismisses the complaint, it must then decide whether to grant leave to amend. The Ninth Circuit has "repeatedly held that a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly

be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (citations and internal quotation marks omitted). Dismissal of a complaint without leave to amend is proper only if it is "absolutely clear that the deficiencies of the complaint could not be cured by amendment." *Noll v. Carlson*, 809 F.2d 1446, 1448 (9th Cir. 1987) (quoting *Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980)); *see also Akhtar v. Mesa*, 698 F.3d 1202, 1212 (9th Cir. 2012).

**DISCUSSION**

Defendants argue plaintiff has failed to sufficiently distinguish between each defendant's conduct as required by Fed. R. Civ. Proc. Rule 8. Mot. to Dismiss 2:12-13 (Dkt. 63). Defendants also argue plaintiff fails to justify extraterritorial application of the Lanham Act. *Id.* at 2:14-15.

**I.   Identification of Defendants**

Plaintiff's original complaint was dismissed for failure to plead with clarity which defendants were allegedly involved in which specific allegations. The Court previously required plaintiff "either identify the appropriate defendant(s) for each claim or explain the reason why plaintiff is unable to do so." Dkt. 49. Defendants now contend that the First Amended Complaint continues to be insufficient in this regard.

Inherent in the sufficiency standard for pleadings under the Federal Rules is the requirement that defendants be placed on notice as to what claim or claims are being asserted against them. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007). At the very least, a plaintiff must identify what allegations pertain to which specific defendant and how they tie into the legal claims asserted.

Plaintiff argues that the amended complaint specifies among defendants as thoroughly as possible at this point. *Id.* at ¶ 5. The FAC identifies all individuals involved in the dispute by name and identifies which defendant company they are associated with. FAC ¶¶ 49-52, 61, 65,

7

74-75, 79. Plaintiff notes that throughout its interactions with defendants, defendants' corporate representations did not match their actual corporate assignments. *Id.* at ¶¶ 47-53, 61, 65, 75. For example, plaintiff notes multiple occasions when individuals within defendant companies held themselves out under the umbrella term "Axel Springer" instead of the particular defendant company they worked for. FAC ¶¶ 51-52, 75. Plaintiff also contends that the corporate structures employed by defendants led to substantial uncertainty as to the delineation of each specific Axel Springer business. *Id.* at ¶¶ 10-28. As a result, plaintiff names each defendant on each cause of action. Opp'n 2:10-16.

Plaintiff asserts that defendants have yet to respond to discovery on these points or provide a response to plaintiff's requests for clarification. FAC ¶ 31; Opp'n 4: n.2. Plaintiff asks the Court to deny defendants' motion because of the lack of identifying information, and to allow the complaint to move past the pleading stage, contending it is an accepted practice in this district. Opp'n 3:11-14; *Espinosa v. Bluemercury, Inc.*, No. 16-cv- 07202-JST, 2017 WL 1079553, at \*5 (N.D. Cal. March 22, 2017).

Defendants contend plaintiff has failed to "plead with sufficient clarity the role of each individual defendant in the allegations." Reply 2:13. Defendants allege plaintiff simply lists each defendant's name on each allegation in an impermissible "shotgun pleading" manner. *Id.* at 2:15-23. Defendants argue that plaintiff's failures are fatal to the complaint's fraud claim. Mot. to Dismiss 3:1-5.

The Court finds plaintiff has carried its burden in identifying defendants adequately at this stage In amending its complaint, plaintiff has identified the defendants as best as it can. In addition, plaintiff has sufficiently explained why plaintiff is unable to name defendants with further specificity. This Court's prior order required plaintiff to amend its complaint to "either identify the appropriate defendant(s) for each claim or explain why plaintiff is unable to do so." Dkt. 49. Plaintiff's complaint states which individual was involved in the alleged conduct, noting

8

each individual by name and business affiliation. FAC ¶¶ 49, 52, 65, 74, 79, 83. Plaintiff also details what statements and representations each individual made and how these factored into plaintiff's allegations. *Id.* ¶¶ 47, 51-54, 57, 60-61, 63, 65-66, 68-72, 74-83. Plaintiff additionally states its belief that, based on these statements and representations, each individual was working on behalf of the defendants as a whole. *Id.* ¶ 10. Plaintiff also details why it has had trouble identifying the parties with further specificity (FAC ¶¶ 10-30), and asks the Court for discovery to assist in alleviating this confusion. FAC ¶ 31. In doing so, plaintiff has carried out the Court's order sufficiently.

The Court finds no merit to defendants' claim that plaintiff used impermissible shotgun pleading. "Shotgun pleadings are pleadings that overwhelm defendants with an unclear mass of allegations and make it difficult or impossible for defendants to make informed responses to the plaintiff's allegations." *SEC v. Bardman*, 216 F.Supp.3d 1041, 1051 (N.D. Cal. Oct. 27, 2016) (quoting *Sollberger v. Wachovia Sec., LLC*, No. SACV 09–0766 AG (Anx), 2010 WL 2674456, at *4 (C.D. Cal. June 30, 2010)). Here, plaintiff has alleged which specific defendants made which specific statements, the representations these statements constituted, how the companies are connected, and where and when each defendant made the statement(s). *See* Supra, pg. 9. Additionally, plaintiff has stated it believes these specific allegations show defendants – acting in concert – harmed plaintiff. FAC ¶ 29. At this stage, especially in light of the complexity of the facts, this is sufficient. *Espinosa v. Bluemercury, Inc.*, No. 16-cv07202-JST, 2017 WL 1079553, at *5 (N.D. Cal. March 22, 2017).

Plaintiff's fraud claims warrant separate consideration. Though defendants' case law is unhelpful to its position,[6] the standard for a fraud claim remains high. Fed. Rule Civ. Proc. 9(b);

---

[6] In *Destfino v. Reiswig*, 630 F.3d 952, 958 (9th Cir. 2011), the court dismissed plaintiff's claim because the complaint alleged that all of the defendants collectively made all of the fraudulent statements, thus making it difficult for the defendants to respond. Here, plaintiff asserts specific individuals made the specific statements which constitute the claims.

*see Swartz v. KPMG LLP*, 476 F.3d 756, 765 (9th Cir. 2007) ("[though] there is no absolute requirement...the complaint must identify *false statements* made by each and every defendant...Rule 9(b)...[requires] a plaintiff must, at a minimum, 'identif[y] the role of [each] defendant[ ] in the alleged fraudulent scheme.'") Here, plaintiff pleads with particularity statements by specific individuals intended to defraud plaintiff. *See* Supra, pg. 9. What are currently lacking are specific allegations as to the various parent-subsidiary-affiliate relationships, which is not fatal at this point. *Espinosa v. Bluemercury, Inc.*, No. 16-cv07202-JST, 2017 WL 1079553, at *5 (N.D. Cal. March 22, 2017) (holding that, in a case involving fraud claim against parent and subsidiary company, plaintiff's complaint was sufficient, and allowing discovery to ascertain further details of the companies' structures and involvement). The Court finds plaintiff has sufficiently identified the defendants with regard to plaintiff's fraud claim.

## II. Trademark Infringement (Counts II and III)

Plaintiff's second and third claims allege trademark infringement under the Lanham Act and California common law. Plaintiff's complaint seeks relief for both extraterritorial and domestic conduct. Accordingly, the Court will analyze the pleadings under both a domestic and extraterritorial framework. *Wells Fargo & Co. v. Wells Fargo Exp. Co.*, 556 F.2d 406, 429 (9th Cir. 1977) ("[W]hen faced with both Mexican and United States activities of an American citizen that were part of one infringing scheme...[the] court adopted an analysis which at least in part was premised on the need to deal with the extraterritorial nature of defendant's activities"); *see also Gallup, Inc. v. Bus. Research Bureau (Pvt.) Ltd.*, 688 F. Supp. 2d 915, 923 (N.D. Cal. 2010) (analyzing extraterritorial application of the Lanham Act when defendant's foreign activities have inflicted or will inflict a cognizable injury upon plaintiff in the United States).[7]

---

[7] Plaintiff argues that it need not allege extraterritorial application of the Lanham Act

10

### A. Domestic Use

"The Lanham Act is the federal trademark and unfair competition statute." *Trader Joe's Co. v. Hallatt*, 835 F.3d 960, 966 (9th Cir. 2016). "To prevail on its Lanham Act trademark claim, a plaintiff must prove: (1) that it has a protectable ownership interest in the mark; and (2) that the defendant's use of the mark is likely to cause consumer confusion." *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1202 (9th Cir. 2012) (internal quotation marks omitted). A plaintiff must also meet "a threshold 'use in commerce' requirement." *Id.* at 1203. Plaintiff's state law trademark infringement claim is "subject to the same legal standards as [its] Lanham Act trademark claim." *Id.* at 1221.

The parties do not dispute the application of *Rearden's* first two elements. They do dispute whether plaintiff has sufficiently pled the defendants' "use in commerce" as required in *Rearden*. Reply at 6. The United States Code, 15 U.S.C.A. § 1127, defines "use in commerce" of goods as being established when "**(A)** [the mark] is placed in any manner on the goods..., and **(B)** the goods are sold or transported in commerce."

Plaintiff asserts that defendants made their upday product available in the Google Play online store, which is accessed by domestic and foreign users. FAC ¶ 126. Plaintiff also notes defendants were photographed at a trade show in San Francisco marketing their product. *Id.* ¶ 127-28. Plaintiff further argues the number of upday English-language downloads (between 100,000 and 500,000), in conjunction with a statement by the CEO of Axel Springer SE,[8] stands for the proposition that upday has been downloaded in the domestic market. *Id.* ¶ 145.

---

because it has sufficiently pled use in the United States. Opp'n 10: 2-16. The Court disagrees. *See Wells Fargo & Co.*, 556 F.2d at 429 (holding, when a plaintiff has alleged both domestic and extraterritorial application of the Lanham Act, the court analyzes the applicability of the Act as to foreign conduct separately from the domestic analysis).

[8] "[G]iven the scale of the U.S. market, the largest part of our English-language business will be in the United States."

11

Defendants respond that other countries use the English language and that the statement by Axel Springer's CEO was taken out of context, since the quote referred to Axel Springer as a whole, not upday.[9] *Id.* at 10:22-26. Defendants thus conclude that the "only fair inference" the Court can draw from plaintiff's allegations is that "[d]efendants are not marketing upday in the U.S. or to U.S. consumers at all." Reply 88:7-8.

Defendants' claim regarding the "only fair inference" is without merit. The factual allegations show that the upday application is available for download in the U.S. The allegations also show the upday team at a San Francisco trade show – presumably marketing their product. FAC ¶ 126-28. While not conclusive, these allegations demonstrate an equally plausible inference in favor of plaintiff's statement that the product is being marketed in the U.S.[10] "If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

As to "use in commerce," plaintiff has demonstrated a reasonable inference that the upday product is being used domestically. While the defendants persuasively attack the English-language argument, the presence of upday at the San Francisco trade show sways the analysis. The photograph at issue determines not just proximity (that upday attended), but that defendants attended as official participants, evidenced by the large display of the "upday" name on defendants' booth. This, combined with the availability of the application in the Google Play store

---

[9] The quote was taken from a newspaper interview in which Axel Springer's CEO detailed long-term plans for Axel Springer as a whole. The article noted the CEO's desire to move into the American market, but did not state this desire was in reference to upday. Mot. to Dismiss 10:22-26, citing Declaration of Rebecca Curwin at ¶ 2, Ex. A ("An Old-Media Empire, Axel Springer Reboots for the Digital Age").

[10] The Court finds plaintiff's English-language argument unpersuasive for the reasons stated in defendants' Reply. Dkt. 72.

for domestic purchase, is sufficient at the pleadings stage. With proper discovery, the question of whether the upday application has been downloaded in the U.S. will be quickly determined.

### B. Extraterritorial Application

Plaintiff alleges that defendants' conduct prohibits plaintiff's expansion into foreign countries because the upday application is pre-installed on mobile devices in numerous foreign countries. (Dkt. No. 51). Plaintiff also alleges that defendants' conduct diverts customers from plaintiff's app to defendants' app, decreasing the value of plaintiff's American held trademark. *Id*. Plaintiff asks the Court to extend the Lanham Act's protection to defendants' foreign activities.

Plaintiff's claim for a Lanham Act violation resulting from foreign conduct is subject to additional analysis. "The Lanham Act applies extraterritorially if: (1) the alleged violations . . . create some effect on American foreign commerce; (2) the effect [is] sufficiently great to present a cognizable injury to the plaintiffs under the Lanham Act; and (3) the interests of and links to American foreign commerce [are] sufficiently strong in relation to those of other nations to justify an assertion of extraterritorial authority." *Trader Joe's*, 835 F.3d at 969 (alterations in original). In order to apply the Lanham Act to foreign activity, a party must satisfy the *Trader Joe's* test.

In its prior order, the Court found plaintiff carried its burden as to the first two prongs of the *Trader Joe's* test. They are not at issue with this motion. Order (Dkt. 49.) Defendants argue plaintiff has not adequately pled the third prong of *Trader Joe's*. Motion to Dismiss at 7:19-21.

The third prong of *Trader Joe's* requires courts to consider: "[1] the degree of conflict with foreign law or policy, [2] the nationality or allegiance of the parties and the locations or principal places of business of corporations, [3] the extent to which enforcement by either state can be expected to achieve compliance, [4] the relative significance of effects on the United States as compared with those elsewhere, [5] the extent to which there is explicit purpose to harm or affect American commerce, [6] the foreseeability of such effect, and [7] the relative importance to the

13

violations charged of conduct within the United States as compared with conduct abroad." *Trader Joe's*, 835 F.3d at 972-73.[11]

This set of factors weighs issues of comity, attempting to avoid "unreasonable interference with other nations' sovereign authority where possible." *Trader Joe's Co. v. Hallatt*, 835 F.3d 960, 972 (9th Cir. 2016). The Court's prior order found that plaintiff's allegations had not met the third prong of the *Trader Joe's* test largely due to inadequate pleadings detailing the need for domestic adjudication. Accordingly, the Court reconsiders the third prong of the Trader Joe's test based on the FAC:

1. <u>Degree of Conflict with Foreign Law or Policy:</u> Plaintiff notes this Court's prior finding that there is no significant policy impact in not deferring to German litigation in extraterritorial application of the Lanham Act. Opp. 11:11-13 (citing Dkt. 49.) Defendants rely on precedential findings that parallel trademark disputes generally constitute a conflict which weighs against extraterritorial application. *Trader Joe's Co.,* 835 F.3d at 973. The 9th Circuit has ruled that an ongoing dispute in a foreign court on a foreign trademark dispute is a factor weighing against extraterritorial application. *Id.* (" Courts typically find a conflict with foreign law or policy when there is an ongoing trademark dispute or other proceeding abroad"); *Star-Kist Foods, Inc. v. P.J. Rhodes & Co.*, 769 F.2d 1393, 1396 (9th Cir. 1985). Here, the parties have been litigating the application of German trademark law regarding a German trademark for over a year. *See generally* Sept. 25, 2017 Declaration of Roman Mallman, Dkt. 17. Because of the German litigation, this factor weighs against extraterritorial application.

---

[11] In the Court's order dismissing the original complaint, the Court noted that while plaintiff asserted defendants' product is available in the United States, it did not allege the "significance of effects," such as the number of downloads or the app's popularity in the United States as compared to abroad. Dkt. 49.

2. <u>Nationality of the Parties and the Locations of the Corporations:</u> Defendants argue their center of business is located in Germany, and that this factor weighs against extraterritorial application. *Id.* at 8:23-24. Defendants also allege the claimed infringement is foreign in nature. *Id.* at 8-9:24; 1-8. The Court finds the defendants are in fact incorporated in the U.S., through Axel Springer Services Inc., and at least part of the complaint is based on defendants' domestic activity.[12] FAC ¶ 7. This factor therefore weighs in favor of extraterritorial application.

3. <u>Expectation of Enforcement:</u> Defendants do not contest this Court's jurisdiction or ability to enforce a judgment. Therefore this factor weighs in favor of extraterritorial application.

4. <u>Relative Significance of the Effects on the U.S. Comparatively:</u> Plaintiff contends it satisfies this factor by "alleg[ing] that it suffered harm." Opp. 12:7-13. This Court has explicitly required more from plaintiff, suggesting for example, production of concrete numbers regarding domestic downloads and or sales. Order at 17:13-15 (Dkt. 49.) Though plaintiff has provided additional allegations of defendants' upday product in the domestic stream of commerce, that alone does not satisfy the requirement. Defendant notes the substantial volume of alleged infringing activity which occurred abroad. These findings show the significance of effect is more strongly felt extraterritorially. This factor weighs against extraterritorial application.

5. <u>Purpose to Harm American Commerce:</u> Plaintiff's premise is that defendants stole plaintiff's trademark, used it for defendants' economic benefit, and as a result plaintiff has been harmed by the loss of sales. FAC ¶¶ 84, 132-38. Plaintiff alleges purposeful conduct on defendants' behalf – that defendants undertook lengthy steps to acquire plaintiff's sensitive product information in an attempt to copy plaintiff's success – that demonstrate harm to

---

[12] Though defendants argue they are predominately foreign, it would be inequitable to find for defendants on this factor. Defendants have availed themselves of the benefits of American trade through incorporation of Axel Springer Services Inc. in Delaware; thus they may not shield themselves from domestic liability by claiming foreign incorporation.

15

domestic commerce *Id.* ¶¶ 47-83. Harm to a domestic corporation harms American commerce. This factor weighs in favor extraterritorial application.

      6.    <u>Foreseeability of Such Effect:</u>   Plaintiff alleges that such blatant infringement necessarily includes foreseeable harm to American commerce, as intentional market confusion likely includes lost sales to a domestic company. *Id.* ¶¶ 144. This Court finds this factor favors extraterritorial application. Taking plaintiff's allegation as true, defendant's infringement and deception almost certainly involves the purposeful ramifications to the party being infringed upon.

      7.    <u>Relative Importance:</u> Plaintiff has failed to demonstrate the relative importance of upday's alleged domestic infringing activity, as compared to the infringing activity that took place extraterritorially. This element analyzes the locality of the infringing activity comparatively. Plaintiff in its own pleadings states upday has achieved substantial success in foreign markets. FAC ¶¶ 88, 92-93. Comparatively, plaintiff has provided only inferential support for upday's domestic presence, which even if true would not compare to upday's foreign popularity and therefore the importance of the infringement abroad. *Id.* ¶¶ 126-28, 130, 145. This factor weighs against extraterritorial application.

When weighing the above seven factors in deciding extraterritorial applicability of the Lanham Act, this Court need not find all factors to extend the Lanham Act. While no explicit requirement of number of factors has been accepted by the courts in this circuit, a court should consider the principle of comity in its analysis. *Wells Fargo & Co. v. Wells Fargo Exp. Co.*, 556 F.2d 406, 428 (9th Cir. 1977). Here, in light of the allegedly intentional capture of plaintiff's concept, in violation of promises made in this country during defendants' trips to Silicon Valley and aimed at expanding defendants' business in this country and internationally, the Court finds

16

that the factual allegations are sufficient, at this time, to litigate the extraterritorial claims plaintiff makes under the Lanham Act.

### III. upday's Motion to Dismiss

Defendant upday's 12(b)(6) motion seeks dismissal of the FAC because most of the allegations against defendants took place prior to defendant upday's existence. Mot. to Dismiss 7-9. Defendant notes that upday was formed on August 7, 2015. Defendant argues the events related to plaintiff's causes of action (breach of contract, fraud, promissory estoppel, and unfair competition) all took place prior to August 2015. *Id.* at 7. Defendant claims California law bars liability for acts or omissions occurring before an entity existed. *Id.* at 8. *See, e.g.*, *Concrete Washout Sys., Inc. v. Terrell Moran, Inc.*, Civ. No. 2:14-0830 WBS CKD, 2015 WL 815835, at *2 (E.D. Cal. Feb. 25, 2015). Defendant also contends that the alter ego doctrine is not applicable. *Id.* 8:24-26.

Plaintiff counters that the FAC alleges that defendants are alter egos of one another and defendant upday cannot escape liability by hiding behind the corporate veil. Opp'n 20-23. Plaintiff claims the alter ego doctrine imputes non-moving defendants' actions and the date of those actions to upday. *Id.*

The alter ego doctrine is a mechanism for imposing liability on a parent company for the actions of its subsidiaries. *Sonora Diamond Corp. v. Superior Court*, 83 Cal. App. 4th 523, 538 (2000). Often referred to as piercing the "corporate veil," the alter ego doctrine allows a party to disregard the corporate form that normally holds parent-subsidiary companies separate in terms of liability.

Though the alter ego doctrine is generally applicable to parent-subsidiary relationships, it

17

has been extended to sister corporations through the "single enterprise theory." *Las Palmas Assocs. v. Las Palmas Ctr. Assocs.*, 235 Cal.App.3d 1220, 1249 (1991) ("Generally, alter ego liability is reserved for the parent-subsidiary relationship. However, under the single-enterprise rule, liability can be found between sister companies [using the test for alter ego liability]"). The inquiry is fact specific. *Id.* at 1248 ("Because it is founded on equitable principles, application of the alter ego is not made to depend upon prior decisions involving factual situations which appear to be similar. ... It is the general rule that the conditions under which a corporate entity may be disregarded vary according to the circumstances of each case.").

To prove an alter ego relationship exists, a plaintiff must show: "(1) that there is such unity of interest and ownership that the separate personalities of the two entities no longer exist and (2) that failure to disregard their separate identities would result in fraud or injustice." *Doe v. Unocal Corp.*, 248 F.3d 915, 926 (9th Cir. 2001) (alterations omitted).

In "assessing whether there is unity of interest for the purposes of alter ego liability," courts typically consider the following nine factors:

> [1] [T]he commingling of funds and other assets of the entities, [2] the holding out by one entity that it is liable for the debts of the other, [3] identical equitable ownership of the entities, [4] use of the same offices and employees, [5] use of one as a mere shell or conduit for the affairs of the other, [6] inadequate capitalization, [7] disregard of corporate formalities, [8] lack of segregation of corporate records, and [9] identical directors and officers.

*Stewart v. Screen Gems-EMI Music, Inc.*, 81 F. Supp. 3d 938, 954 (N.D. Cal. 2015). In determining whether a unity of interest exists, a court need not find that every factor is present. *Johnson v. Serenity Transportation, Inc.*, 141 F. Supp. 3d 974, 985 (N.D. Cal. 2015).

Here, plaintiff has sufficiently alleged that a unity of interest exists between defendants. Plaintiff has adequately pled that defendant Axel Springer SE guaranteed Samsung that it would be liable for the debts of defendant upday (Opp'n 5:13-18); defendant Axel Springer SE wholly owns and controls defendant upday (FAC ¶¶ 11-12); all defendants share a business address (FAC

¶¶ 6, 8-9); and defendant upday signed a contractual agreement with Samsung less than a month after upday's creation, suggesting upday serves as a shell entity to Axel Springer SE (the party who negotiated the contract terms) (Opp'n 4:6-13). These allegations are sufficient to allege a unity of interest at this stage.

The second prong of the alter ego test requires a showing that defendants' bad faith would result in injustice unless defendants' separate identities are ignored.[13] "The injustice that allows a corporate veil to be pierced is not a general notion of injustice; rather, it is the injustice that results only when corporate separateness is illusory." *Bank of Montreal v. SK Foods, LLC*, 476 B.R. 588, 600 (N.D. Cal. 2012). "Inequitable results flowing from the recognition of the corporate form include the frustration of a meritorious claim, perpetuation of a fraud, and the fraudulent avoidance of personal liability." *Pac. Mar. Freight, Inc. v. Foster*, No. 10-CV-0578-BTM-BLM, 2010 WL 3339432, at *7 (S.D. Cal. Aug. 24, 2010).

Plaintiff has alleged bad faith sufficient to show injustice would result if defendants' separate identities are not ignored. Defendants made overtures to plaintiff through multiple individuals who misidentified, or were not clear about, their corporate affiliations. FAC ¶¶ 47-53, 61, 65, 74-75, 79. Defendants promised business opportunities to plaintiff in order to give defendants access plaintiff's proprietary information. Defendants then created a separate corporate entity to misappropriate and use that information for their own benefit, according to the complaint. *See* FAC ¶¶ 47-102.

Defendants now claim that the events leading up to the acquisition of plaintiff's intellectual

---

[13] Courts in this circuit vary on whether a showing of bad faith is required when pleading the second prong of the alter ego test. *P. Bell Tel. Co. v. 88 Connection Corp.*, No. 15-CV-04554-LB, 2016 WL 3257656, at *5 (N.D. Cal. June 14, 2016) (detailing the position that a bad faith showing is not required in either California courts or in the 9th Circuit); *Gerritsen v. Warner Bros. Entm't Inc.*, 116 F. Supp. 3d 1104, 1143 (C.D. Cal. 2015) (court noted as part of alter ego liability a finding of bad faith is required in the second prong of the test). The 9th Circuit has clarified that bad faith is required except with claims of the inequity arising out of under-capitalization or misrepresentation to creditors by the parent company. *Sentry Life Ins. Co. v. Roberts*, 925 F.2d 1470 (9th Cir. 1991). Because neither exception is alleged here, a claim of bad faith is required to establish alter ego liability.

property were committed by one entity, and the actual infringement was committed by another. Dkt. 80. Defendant argues that though these entities share a unity of interest and executives (indeed, one of the original Axel Springer executives who met with plaintiff is now the CEO of upday), upday can escape liability because some of the activities occurred before upday was created. *Id.* The Court finds this would be an injustice resulting from defendants' bad faith conduct. As such, plaintiff has met this prong.

Accordingly, the Court DENIES defendant upday's motion to dismiss.

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby DENIES defendants' motions to dismiss. Dkt. Nos. 63, 80.

**IT IS SO ORDERED**.

Dated: March 7, 2018

_____
SUSAN ILLSTON
United States District Judge

20